William D. JOHNSON,
Plaintiff–Appellee,

v.

Powell F. CARTER,
Defendant–Appellant,

**United States of America, Appellant.**

No. 90–3077.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 3, 1990.

Decided July 8, 1991.

As Amended Aug. 20, 1991.

Rehearing En Banc Granted, Opinion
Vacated Oct. 9, 1991.

Patricia M. Bryan, Deputy Asst. Atty. Gen., Civ. Div., U.S. Dept. of Justice, Washington, D.C., argued (Stuart M. Gerson, Asst. Atty. Gen., Barbara L. Herwig, Michael E. Robinson, Civ. Div., U.S. Dept. of Justice, Washington, D.C., Henry E. Hudson, U.S. Atty., Norfolk, Va., Richard F. Walsh, Office of the Judge Advocate Gen. of the Navy, Alexandria, Va., on brief), for appellants.

Jeremiah A. Denton, III, Virginia Beach, Va., for plaintiff-appellee.

Before WIDENER and SPROUSE, Circuit Judges, and NICKERSON, District Judge for the District of Maryland, sitting by designation.

## OPINION

SPROUSE, Circuit Judge:

We consider whether the United States must be substituted as the sole defendant in a suit against a United States military officer for alleged tortious conduct. Involved is an interpretation of the Federal Employees Liability Reform and Tort Compensation Act of 1988 (the Westfall Act). We also consider whether the officer has military immunity under the doctrine announced in *Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), and whether the suit should have been brought under the Civil Service Reform Act of 1978, Pub.L. 95–454, 92 Stat. 1111 *et seq.*

William D. Johnson, a civilian law enforcement officer stationed at the Norfolk Naval Base in Virginia, sued Admiral Powell F. Carter, Jr., Commander–in–Chief of the United States Atlantic Fleet, in state court for claims arising out of an incident in which Carter allegedly called Johnson "a liar." Johnson sought damages for slander, libel, insulting words, intentional infliction of emotional distress, and tortious interference with contractual and business relations. After removing the case to federal district court, pursuant to 28 U.S.C. §§ 1442, 1442a, and 2679(d)(2), Carter moved to substitute the United States as sole defendant, pursuant to the Westfall Act which requires that suits against Federal employees for actions committed within the scope of their office or employment be brought only under the Federal Tort Claims Act.[1] Alternatively, Carter moved to dismiss the case on grounds of intramilitary immunity under *Feres*. The district court denied these motions. However, it granted a stay of further proceedings pending this appeal. We affirm.

---

1. Johnson's actions for libel and slander, however, could not have been brought under the FTCA because actions of this type are excluded under the Act. 28 U.S.C. § 2680(h).

## I.

Carter is the Commander–in–Chief of the U.S. Atlantic Fleet, which has its shore installation at the Norfolk Naval Base in Virginia. On Sunday, the 18th day of June, 1989, Johnson, a civilian law enforcement officer of the Naval Base Security Force, stopped Janeen Carter, Admiral Carter's daughter, for speeding and issued her a warning. Travelling in a separate car, Carter's wife witnessed the incident and provided the vehicle number of Johnson's patrol car when she related the incident to her husband. She, along with Janeen, alleged that Johnson was "rude and intimidating" during the stop.

Carter, who had received similar complaints about discourteous conduct on the part of base patrolmen, concluded that the patrolman had been abusive and "requested" two of Johnson's superiors to bring him to Carter's quarters.[2] On that same Sunday afternoon, two of Johnson's superiors escorted Johnson to the garden of Carter's place of residence where the latter was tending his garden dressed in casual civilian clothes. Carter contends that he directed most of his comments to the duty officer or the supervisor, remarking on the persistent problem of discourtesy by base police and the need to correct the problem. In any event, in reply to Carter's inquiry, Johnson denied he had engaged in rude conduct directed at Carter's wife and daughter. In his deposition, Carter stated that he "believes" he responded "I think you are lying." However, Johnson in his affidavit averred that Carter, in response to his denial, said, "You are a liar."

The next day, Carter formally complained[3] about Johnson's conduct and a local newspaper reported the incident. Fol-

lowing an investigation, civilian authorities of the Naval Base Security Force recommended and approved a two-day suspension for Johnson. An arbitration panel later reduced the suspension to a letter warning.

The district court found "incredible" the U.S. Attorney's certification that Carter was acting within the scope of his employment. In its order denying the motion for reconsideration, the district court set forth in writing its reasons for denying the government's motion to substitute or to dismiss. In distinguishing *Wallen v. Domm*, 700 F.2d 124 (4th Cir.1983), which involved a charge of assault against the plaintiff's supervisor, the district court noted that there the discussion that formed the basis for the charge took place on a normal work day in the defendant's office, that the defendant was the immediate supervisor of the plaintiff and that the substance of the discussion was entirely work-related. In contrast, the district court noted that the incident in the case *sub judice* occurred on a Sunday while the Admiral was at home gardening in civilian clothing, that Carter is not the base commander, and that the essence of the conversation concerned the altercation between Carter's daughter and Johnson as opposed to problems of base security. Finally, the court questioned whether such immediate action would have been taken if a civilian's daughter had been stopped by Johnson.

On appeal, Carter challenges the district court's refusal to substitute the United States as defendant, its refusal to dismiss the case under the *Feres* doctrine, and contends that the Civil Service Reform Act (CSRA) preempts state common law remedies for employment related actions like

---

**2.** Carter indicated in his formal statement in the district court that he only instructed that a duty officer and a supervisor from the Naval Base Security Force report to his quarters so that he could identify the patrolman in question. According to Carter, he only wanted to learn the person's identity so that he could file a complaint against that patrolman. The two officers that arrived with Johnson both indicated, however, one in her deposition testimony and the other in a contemporaneously written memorandum to the chief of police, that Carter requested that Johnson be brought to his resi-

dence. The district court as indicated in its order granting the stay resolved this in favor of Johnson—finding that Johnson was escorted to Carter's residence on the latter's instruction.

**3.** In his statement supporting the motion to substitute, Carter said that he called Base Commander Admiral Pappas at his office the morning after the incident, reported the incident to him, and requested that normal investigative procedures be employed.

that of the appellee. We consider his contentions in that order.

## II. Westfall Act

Carter argues that the United States should have been substituted as sole defendant in the action pursuant to 28 U.S.C. § 2679(d)(1) (the Westfall Act).[4] In denying Carter's motion to substitute the United States, the district court rejected the United States Attorney's certification that Carter was acting within the scope of his employment.[5] Carter argues that the district court erred in reaching a conclusion contrary to the attorney general's certification. Johnson, of course, argues in support of the district court's finding that Carter was not acting within the scope of his office or employment when he called him a liar. He stresses that Carter was acting in violation of naval regulations, without authority, and out of personal motivation.

■ Determination of whether an employee's actions are within the scope of employment for purposes of the Act involves a question of law as well as fact. *See S.J. & W. Ranch, Inc. v. Lehtinen,* 913 F.2d 1538, 1542 (11th Cir.1990). However, where the facts are not in dispute, the "determination of the scope of employment is a question of law, reviewable *de novo.*" *Washington v. United States,* 868 F.2d 332, 334 (9th Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 539, 107 L.Ed.2d 536 (1989).

As here however, where some facts are in dispute,[6] the standard of review as to those factual findings is whether they are clearly erroneous. *See McCluggage v. United States,* 392 F.2d 395, 397 (6th Cir.1968) (applying clearly erroneous standard to finding of fact on the issue of scope of employment in FTCA case).

■ Whether an employee's actions fall within the scope of his employment pursuant to the Westfall Act and FTCA is to be determined according to the rules of *respondeat superior* of the state in which the wrongful conduct occurred. *Nasuti,* 906 F.2d at 805 n. 3; *Arbour,* 903 F.2d at 421–22; H.R.Rep. 100–700, 100th Cong., 2d Session 5, *reprinted in* 1988 U.S.Code Cong. & Admin.News at 5945, 5949; *citing Williams v. United States,* 350 U.S. 857, 76 S.Ct. 100, 100 L.Ed. 761 (1955).

■ The test in Virginia is whether the act was fairly and naturally incident to the employer's business, was done while the employee was engaged upon the employer's business, and was done with a view to further the employer's interests. *Roughton Pontiac Corp. v. Alston,* 236 Va. 152, 372 S.E.2d 147 (1988), *see also United Brotherhood v. Humphreys,* 203 Va. 781, 127 S.E.2d 98, 102 (1962), *cert. denied,* 371 U.S. 954, 83 S.Ct. 509, 9 L.Ed.2d 501 (1963); *McNeill v. Spindler,* 191 Va. 685, 62 S.E.2d 13, 17 (1950); *Manuel v. Cassada,* 190 Va. 906, 59 S.E.2d 47, 50

---

**4.** The Westfall Act provides in relevant part: Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provision of this title and all references thereto, and the United States shall be substituted as the party defendant.

28 U.S.C. § 2679(d)(1).

The Westfall Act is Congress' response to the Supreme Court's decision in *Westfall v. Erwin,* 484 U.S. 292, 108 S.Ct. 580, 98 L.Ed.2d 619 (1988), which limited a federal official's absolute immunity from tort claims to situations where the official's action was "within the outer perimeter of an official's duties *and* is discretionary in nature." *Id.* at 300, 108 S.Ct. at 585 (emphasis added). Congress viewed this as an erosion of the common law tort immunity formerly available to federal employees. *See Arbour v. Jenkins,* 903 F.2d 416, 420 (6th Cir.1990). Congress restored the absolute immunity of government employees for acts within the scope of their employment providing that the Federal Tort Claims Act (FTCA) is the sole avenue for suits arising therefrom.

**5.** Carter concedes that certification by a United States Attorney is subject to review for substitution purposes. 28 U.S.C. § 2679(d)(1). As our sister circuit observed in *Nasuti v. Scannell,* 906 F.2d 802, 812 (1st Cir.1990), while section 2679(d)(2) provides that the prior certification "shall conclusively establish scope of office or employment *for purposes of removal"* (emphasis in original) section (d)(1) does not. *See also Arbour,* 903 F.2d at 421.

**6.** *See* note 1, *supra.*

(1950). Scope of employment is determined from the surrounding circumstances, including character of the employment, nature of the wrongful deed, time and place of its commission as well as the purpose of the act. *See, e.g., Abernathy v. Romaczyk*, 202 Va. 328, 117 S.E.2d 88, 92 (1960) (scuffle held independent venture to gratify personal feelings); *Bryant v. Bare*, 192 Va. 238, 64 S.E.2d 741, 747 (1951) (accident occurring when employee had, after earlier detour, proceeded on highway as instructed held within scope); *Appalachian Power Co. v. Robertson*, 142 Va. 454, 129 S.E. 224, 227–28 (1925) (courtesy performed for third person during meal hour off of work premises held not within scope); *Drake v. Norfolk Steam Laundry Corp.*, 135 Va. 354, 116 S.E. 668, 670 (1923) (going out of way for own purposes on an errand that began and was to end in service of employer held within scope).

■ Carter cites naval regulations detailing the duties of naval commanders and the Commander–in–Chief of the U.S. Atlantic Fleet specifically. He points out, among other things, that he is "responsible for the administration, training, maintenance, support and readiness of the Atlantic Fleet including those forces temporarily assigned to the operational command of other commanders,"[7] that he may "exercise authority through his immediate subordinate commanders [or] he may communicate directly with any of his subordinates," and that he holds the same relationship to shore activity of his command in which his headquarters are located—here, the Norfolk Naval Base. Specifically, Carter argues that general supervision of base security forces is among his responsibilities.[8]

Johnson also relies on naval regulations to support his contrary contention—that Carter was acting outside the scope of his employment. He particularly stresses Navy Regulation 721.18 to the effect that a military officer may not participate in any action which has the appearance of a conflict of interest.[9] Johnson also notes regulations that prohibit tyrannical behavior and abusive language in dealings with subordinates[10] as well as proscribe the use of insulting or defamatory language in general.[11] Johnson contends that pursuant to Article 0702 of the Navy regulations, when Carter violated these regulations, he did so "upon his own responsibility."[12]

In our view, consideration of the cited naval regulations alone presents a close question of whether Carter was acting within the scope of his employment. Assuming, however, that the regulations cited by Carter vested him with military authority, and that the authority was not vitiated by the conflict-of-interest regulations, there remains the question under Virginia law whether he was acting with the *purpose* of fulfilling these responsibilities as a naval commander or for personal reasons. In this context, Carter argues that a mixed personal/official motive would suffice to support his actions as coming within the scope of his employment pursuant to a "dual purpose doctrine," citing *Kensington Assoc. v. West*, 362 S.E.2d 900 (1987). In *Kensington*, the Virginia Supreme Court found that conduct which is prohibited by the employer may be activity not con-

7. 32 C.F.R. § 700.309.

8. OPNAVINST 5530.14b ¶ 5.

9. 32 C.F.R. § 721.18(b)(4) and (d) provide that a naval officer must ...
(b) Avoid any action, whether or not specifically prohibited, which might result in or reasonably be expected to create the appearance of:
\* \* \* \* \* \*
(4) Losing complete independence or impartiality.
\* \* \* \* \* \*
(d) ... not engage in any activity that might result in or reasonably be expected to create the appearance of a conflict of interest.

10. Navy Regulation 0814 provides:
Persons in authority are forbidden to injure their subordinates by tyrannical or capricious conduct or by abusive language.

11. *See* 10 U.S.C. § 933.

12. 32 C.F.R. § 700.702(h) provides:
A commanding officer who departs from his orders or instructions, or takes official action which is not in accordance with such orders or instructions, does so upon his own responsibility. ...

sidered to be within the scope of employment. *Kensington* involved a security guard shooting the plaintiff construction worker in the foot when the former was attempting to remove a gun from his holster in the construction employee recreation room. The court there found that the employer had given the employee specific instruction not to "bother" the construction workers. The court found that neither the horseplay nor the resulting shooting were done in furtherance of the employer's interests. Rather, they "arose wholly from an independent, external, and personal motive on [the employee's] part to perform an act upon his own account.... [H]e embarked upon an independent venture to satisfy his own personal desire to have 'fun' and 'play.'" *Id.* at 903.

Likewise, in *Abernathy v. Romaczyk*, 202 Va. 328, 117 S.E.2d 88, 92–93 (1960), the court held that the employee's engagement in an argument and subsequent scuffle with the plaintiff after a traffic accident was "an independent venture of his own to gratify his personal feelings, and the relation of master and servant was for a time suspended." The language in neither *Kensington* nor *Abernathy* establishes a rule which would equate authority to perform an act with acting *pursuant* to that authority for purposes of finding that an employee acted within the scope of employment.

In sum, we are not inclined to disturb the district court's finding that Carter was not acting within the scope of his employment. The alleged incident occurred in Carter's garden where, dressed in casual civilian clothing, he was engaged in a quintessential civilian activity. The court could have understandably determined that the single traffic incident, even against a background of general complaints, did not pose such a grave and immediate problem and that its resolution could have been postponed until the next day—a normal working day where the admiral could have determined the facts concerning the incident in his base office under normal military procedure. It was apparently significant to the district court that, from Carter's own admissions, he had received previous complaints about the discourteousness of the base's security officers, but that it was not until the incident involving his wife and daughter that he decided to take action, and then on a Sunday under circumstances suggesting a familial concern. If Carter's allegedly tortious conduct had occurred in a meeting in his office during the work week and was conducted pursuant to regulations, there is no question but he would have been acting within the scope of his authority. Any tort he may have committed under those circumstances would have been sheltered by absolute immunity. *Wallen v. Domm*, 700 F.2d 124 (4th Cir.1983). Here, unlike *Wallen*, however, we are not faced with the question of whether the commission of a tort can be within the scope of employment. *Wallen* answered that question in the affirmative. *Id.* at 126. The question here is whether Carter's participation in the incident fell in any way within the scope of his employment. We think that the district court correctly interpreted the law and that its factfinding that Carter's intent was not to further the military's interest and that he was not acting within the scope of his duties is supported by the record and, thus, not clearly erroneous. The putative merit of Johnson's substantive complaints is another question. We only decide that those questions must be determined on remand.

### III. *Feres* Doctrine

Neither do we agree that the Feres doctrine bars Johnson's suit. The principles of intramilitary immunity were set forth in *Feres v. United States*, 340 U.S. 135, 146, 71 S.Ct. 153, 159, 95 L.Ed. 152 (1940), for injuries that "arise out of or are in the course of activity incident to service." The rule is based on "[t]he peculiar and special relationship of the soldier to his superiors, the effects of the maintenance of such suits on discipline, and the extreme results that might obtain ...," *United States v. Brown*, 348 U.S. 110, 112, 75 S.Ct. 141, 143, 99 L.Ed. 139 (1954), and reflects the notion that courts should not interfere with the management of the military or "call[ ] into question basic choices about the discipline,

supervision, and control of a serviceman." *United States v. Shearer*, 473 U.S. 52, 58, 105 S.Ct. 3039, 3043, 87 L.Ed.2d 38 (1985).

■ The *Feres* doctrine may bar a claim by a civilian plaintiff if the incident brings into question command or personnel decisions by military officers. *McGowan v. Scoggins*, 890 F.2d 128, 138 (9th Cir.1989). In *McGowan*, a college professor who had received a medical discharge from the armed forces many years earlier was detained and allegedly assaulted by military police officers while on base obtaining a parking sticker. In finding that the *Feres* doctrine did not bar McGowan's suit, the Ninth Circuit found it significant that the professor was not employed at the base nor was his work elsewhere subject to military supervision, command or discipline.

■ In the case we consider, Johnson was employed at the military base, but Carter admitted in his deposition that he never directly supervised any patrol officer as an immediate subordinate and that the meeting he called with the officer was not for the purpose of discipline. He also conceded that reprimanding Johnson through formal disciplinary action was beyond his authority. Admiral Carter is not the commanding officer of the base, and, as he stated in his deposition, he does not have the "ability to officially exert punitive action like to suspend somebody, to reduce their pay, to fire them . . . ." Thus the case *sub judice* does not implicate the concern for maintenance of disciplinary control over subordinates protected by the *Feres* doctrine.

### IV. The Civil Service Reform Act

■ Carter finally contends that even if the *Feres* doctrine does not bar Johnson's claims, the latter should be relegated to remedies under the Civil Service Reform Act. *Bush v. Lucas*, 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983). The CSRA is applicable only to personnel actions involving one of the enumerated prohibited personnel practices: an appointment, promotion, disciplinary or corrective action, a detail, transfer or reassignment, a reinstatement, a restoration, a reemployment, a performance evaluation, a decision concerning pay benefits or awards, or any other significant change in duties or responsibilities. 5 U.S.C. § 2302(a)(2)(A).

Johnson's suit does not arise out of disciplinary or corrective action as Carter contends. Carter admitted he did not intend to discipline Johnson but rather to file a formal complaint, on a personal level. Further, the disciplinary action that was ultimately taken against Johnson is not the basis of this suit. *See, e.g., Pinar v. Dole*, 747 F.2d 899 (4th Cir.1984) (federal employee action contesting termination of temporary promotion and subsequent suspension), *cert. denied*, 471 U.S. 1016, 105 S.Ct. 2019, 85 L.Ed.2d 301 (1985).

### CONCLUSION

For all the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.

WIDENER, Circuit Judge, dissenting:

I respectfully dissent.

I would hold that the Attorney General's certification that Admiral Carter was acting within the scope of his employment precludes consideration of that issue by the courts. In addition, even if consideration is not precluded, I would hold that the district court did not give proper weight in making its factual findings either to the Virginia presumption in favor of finding acts of an agent to be within the scope of employment, or the Navy Regulation putting Admiral Carter on duty "at all times." Therefore, I would hold those findings to be clearly erroneous.

### I

By the plain language of 28 U.S.C. § 2679(d)(2), no discretion is given to the district court. If the Attorney General certifies that the defendant employee was acting within the scope of his employment, "the United States *shall* be substituted as the party defendant." 28 U.S.C. § 2679(d)(2).

The courts of appeal are split regarding this issue. The First, Third, Sixth, and Eleventh Circuits follow the course taken by the district court and do not defer to the Attorney General's determination.[1] See *S.J. & W. Ranch, Inc. v. Lehtinen*, 913 F.2d 1538 (11th Cir.1990); *Melo v. Hafer*, 912 F.2d 628 (3d Cir.1990), *cert. granted*, apparently on other grounds, —— U.S. ——, 111 S.Ct. 1070, 112 L.Ed.2d 1176 (1991); *Nasuti v. Scannell*, 906 F.2d 802 (1st Cir. 1990); *Arbour v. Jenkins*, 903 F.2d 416 (6th Cir.1990). The Fifth and Tenth Circuits follow Congress' express language and give conclusive effect to the Attorney General's certification. See *Mitchell v. Carlson*, 896 F.2d 128 (5th Cir.1990); *Aviles v. Lutz*, 887 F.2d 1046 (10th Cir. 1989).[2] In my opinion, a sufficient reason for reversal is the district court's failure to give conclusive effect to the Attorney General's certification of scope of office or employment.[3]

## II

Even if the district court had the authority to disregard the Attorney General's certification of scope of office or employment, I conclude that its factual finding that Admiral Carter's actions were outside the scope of employment was clearly erroneous.

As the majority correctly states, Virginia's rules of *respondeat superior* govern the determination of whether Admiral Carter was acting within the scope of his employment. Maj. op. at 184. In Virginia,

once the employment relationship has been established (and it is conceded here), the party opposing a finding of *respondeat superior* has the burden of proving the employee was outside of the scope of employment when the incident occurred. See, e.g., *Slaughter v. Valleydale Packers, Inc.*, 198 Va. 339, 343–44, 94 S.E.2d 260, 263–64 (1956); *Alvey v. Butchkavitz*, 196 Va. 447, 453, 84 S.E.2d 535, 539 (1954) ("We have repeatedly held that where the relationship of master and servant has been established the burden is on the master to prove that the servant was not acting within the scope of his employment when he committed the act complained of....)"; *Crowell v. Duncan*, 145 Va. 489, 501, 134 S.E. 576, 579 (1926) ("Where it is doubtful whether a servant in injuring a third person was acting within the scope of his authority, the doubt will be resolved against the master....."). Admiral Carter established that he was employed by the United States. Therefore, the burden was on Johnson to prove that Admiral Carter's actions were outside of the scope of employment. The district court thus erred in not applying the Virginia presumption to this case.

In Virginia an act is deemed to be within the scope of employment if:

(1) it was expressly or impliedly directed by the employer, or is naturally incident to the business, and

(2) it was performed, although mistakenly or ill-advisedly, with the intent to further the employer's interest, or from

---

1. These courts believed there would be potential separation of powers problems if the Attorney General's scope certification was given conclusive effect. I do not agree.

    We recently held that, in ordinary circumstances, a reduction in sentence for assisting the government can only occur upon motion of the government as stated in the sentencing guidelines. *United States v. Francois*, 889 F.2d 1341 (4th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1822, 108 L.Ed.2d 951 (1990). We found no separation of powers problem with vesting absolute discretion in the prosecutor in deciding whether to file a motion or not.

2. The Ninth Circuit held that § 2679(d) did not apply if to do so would deprive the plaintiff of his remedy against the government. *Smith v. Marshall*, 885 F.2d 650 (9th Cir.1989). But the

Supreme Court rejected the Ninth Circuit approach and reversed *sub nom. United States v. Smith*, —— U.S. ——, 111 S.Ct. 1180, 113 L.Ed.2d 134 (1991). The Court held that "Congress recognized that the required substitution of the United States as the defendant in tort suits filed against Government employees would sometimes foreclose a tort plaintiff's recovery altogether." —— U.S. at ——, 111 S.Ct. at 1185.

3. The majority states that the government conceded that certification by a United States Attorney is subject to review for substitution purposes. While the government's position is unnecessarily ambivalent, it should be relieved of a concession improvidently made. See *Denny v. Seaboard Lacquer, Inc.*, 487 F.2d 485, 492 (4th Cir.1973).

some impulse or emotion that was the natural consequence of an attempt to do the employer's business, "and did not arise wholly from some external, independent, and personal motive on the part of the [employee] to do the act upon his own account."

*Kensington Assoc. v. West*, 234 Va. 430, 432, 362 S.E.2d 900, 901 (1987) (citations omitted).

It cannot be said from anything in this record that Admiral Carter's summoning of a base police officer arose "wholly from some external, independent, and personal motive" on his part. Undisputed contemporaneous written records corroborate that Admiral Carter had previously and consistently expressed his displeasure with the conduct of the base police, and that he took action to remedy the situation. Upon taking command of the Atlantic Fleet, Admiral Carter became aware of problems with the quality of life of naval personnel on the bases around Norfolk and attempted to improve the situation. The conduct of the base police had been a concern of his for quite some time. As early as November 16, 1988, he expressed his concerns to Rear–Admiral Pappas about reports he had heard concerning rude conduct by base police. He expressed those concerns on numerous occasions. On November 22, 1988, Admiral Carter noted that Rear Admiral Pappas "[t]old me results [of] looking into discourtesy.... Stories on police hard to pin down. Not many H.L. complaints. People may feel its their word against police so its no use." On February 2, 1989, Carter noted that he had told Pappas that "MG Doran USAF is *another* who has had probs w/ police discourtesy to his guests on base. Realize *many* of police are great, but evidence is there are a few out of line. Need identify ☞ correct." Carter's notes indicate an increasing level of frustration with the inability to correct the problems of police rudeness because of difficulties in identifying the personnel who were causing the problems. Therefore, it is not surprising that he took direct and immediate action when his wife was able to identify a policeman who had acted rudely.

Both the majority and the district court gave controlling weight to the fact that the "incident occurred in Admiral Carter's garden where, dressed in casual civilian clothing, he was engaged in a quintessential civilian activity." Maj. op. at 185. The majority decision even admits that if the incident had occurred in Admiral Carter's office "during the work week" and was conducted pursuant to regulations, "there is no question but he would have been acting within the scope of his authority." Maj. op. at 185. Where and when Admiral Carter exercises his authority is of no moment, however. By Navy Regulations, Admiral Carter, while on active service, is "at all times subject to naval authority" and "may ... exercise authority over all persons who are subordinate to [him]." 32 C.F.R. § 700.811(a) (1990). Therefore, Admiral Carter had the authority to summon a base police officer at any time. If he so chose, Admiral Carter could direct movements of the Atlantic Fleet from his garden, dressed in civilian clothing. His attire and location do not determine whether his acts were within the scope of his authority. He patently had the authority to summon Johnson to his home and he exercised that authority.

The allegedly tortious incident can not be looked at in isolation from the context in which it occurred. As we stated in *Wallen v. Domm*, 700 F.2d 124, 126 (4th Cir.1983), a pre-Westfall Act common law immunity case:

Few government officials are authorized to commit torts as a part of their line of duty, but to separate the activity that constitutes the wrong from its surrounding context—an otherwise proper exercise of authority—would effectively emasculate the immunity defense. Once the wrongful acts are excluded from an exercise of authority, only innocuous activity remains to which immunity would be available. Thus, the defense would apply only to conduct for which it is not needed.

We also made clear that "[a]pplication of the immunity is not affected by whether the injury was committed in good faith, negligently, or even intentionally." *Wallen v. Domm*, 700 F.2d 124, 126 (4th Cir. 1983).

The district court "found it incredible that the United States Attorney could make an affidavit that the words of the Admiral that the policeman who had stopped the Admiral's daughter for speeding was 'a liar,' were words spoken while the Admiral was acting within the scope of his employment as an employee of the United States." But the district court improperly looked at the words spoken in isolation from the surrounding acts. The question is, was the underlying conversation between Johnson and Admiral Carter "an otherwise proper exercise of authority" by Admiral Carter, not, as the majority holds, whether Admiral Carter spoke improperly during the conversation.

In *Barr v. Matteo*, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), the Supreme Court stated it is "the relation of the act complained of to 'matters committed by law to his control or supervision'—which must provide the guide in delineating the scope of the rule which clothes the official acts of the executive officer with immunity from suit." 360 U.S. 564, 573–74, 79 S.Ct. 1335, 1340–41, 3 L.Ed.2d 1434 (1959) (citation omitted). Control of the base policies was a matter committed by law to Admiral Carter's control or supervision, therefore, in my opinion, his activities were within the scope of his employment.

I should also add that I think the district court erred in holding that "to substitute the United States as the sole defendant, and to then dismiss the plaintiff's claims ... [would] completely ignore any semblence of constitutional 'due process' to the plaintiff on his claim of alleged slander and libel." The Supreme Court, in *United States v. Smith*, —— U.S. ——, 111 S.Ct. 1180, 113 L.Ed.2d 134 (1991), while it did not phrase its reasoning in constitutional terms, expressly rejected recovery on that very account and held that government employees are immunized from suit "even when an FTCA exception precludes recovery against the Government." —— U.S. at ——, 111 S.Ct. at 1184–85.

### III

The fact that I have not addressed at any length the *Feres* doctrine or the Civil Service Reform Act should not indicate that I agree with either part of the majority decision with respect to those theories, for I do not.

Briefly, I think the *Feres* doctrine should apply for the reasons stated in *United States v. Shearer*, 473 U.S. 52, 59, 105 S.Ct. 3039, 3043, 87 L.Ed.2d 38 (1985), in construing *Feres*, for I think the claim here is "... the *type* of claim[ ] that, if generally permitted, would involve the judiciary in sensitive military affairs at the expense of military discipline and effectiveness." (italics in original). I further agree with Judge Murnaghan's language in his concurrence in *Thigpen v. United States*, 800 F.2d 393, 403 (4th Cir.1986) where he states that "[a]fter *Shearer*, then, the *Feres* doctrine must mean that no waiver of sovereign immunity may be found with respect to any claim, whether brought by a serviceman or a civilian, that challenges a military 'decision of command' relating to the effective management of military personnel and resources." With respect to the Civil Service Reform Act, that Act was not mentioned until appeal and should not be considered by us. *McGowan v. Gillenwater*, 429 F.2d 586 (4th Cir.1970).

As I have indicated above, however, I am of opinion that we should not reach either the *Feres* doctrine or the Civil Service Reform Act, for Admiral Carter should not be subjected to a claim for liability in a civil court in this case because of the provisions of the Westfall Act.

### IV

This case involves much more than merely the construction of the federal statute and the Virginia law on scope of employment. It has to do with the ability and obligation of one of the principal officers of the United States to perform his duty unhampered by having to answer for the same in a civil court. No one can seriously contend that Admiral Carter would not have the authority to order the movement of ships and aircraft from the same garden involved here (which is owned by the government) on N.O.B. Norfolk at any

hour of the day or night, for, pursuant to Navy Regulations "while on active service" he might "exercise authority over all persons who are subordinate" to him. It is just as true, and even the majority admits, that Admiral Carter had authority over the base policeman of N.O.B. Norfolk who is involved in this case. Since Admiral Carter had authority to control the base policeman in the performance of his (Admiral Carter's) duty, then he had the authority to perform that duty other than in a manner entirely in accord with public sensibilities (even if the words charged were uttered, which is admitted for argument).

The manner in which Admiral Carter performed his duty should not be subject to review by a civil court under the Westfall Act upon proper certification, as here, and that is what the Westfall Act is all about. I am of opinion that it should be, and it is, entirely within the province of Congress to provide, as it has, that the employment of certain officers and servants of the United States, such as Admiral Carter, is of such importance to the nation that their acts within the scope of their office or employment are shielded from liability unless Congress has specifically provided otherwise. I am further of opinion that it is entirely within the province of Congress to provide that the certification of the Attorney General conclusively establishes not only the scope of office or employment for the purposes of removal but also conclusively establishes that "[u]pon certification" "[s]uch action" "shall be deemed to be an action ... brought against the United States ... [which] shall be substituted as the party defendant." 28 U.S.C. § 2679(d)(2). And I also would construe literally and within the authority of Congress the provisions of § 2679(b)(1) that "[a]ny other civil action or proceeding [except under §§ 1346(b) and 2672] for money damages arising out of or relating to the same subject matter against the employee or the employee's estate is precluded without regard to when the act or omission occurred."

An analogy close to home will serve to make my point. 28 U.S.C. § 452 provides that the courts of the United States will always be in session. And there is not a one of us who has not in practice applied for and received injunctive or other like extraordinary relief from a judge, state or federal, at his home, and not on the bench or in his office. And the hour of the day or night does not make any difference, nor do Saturdays, Sundays, or holidays, as we all know. Why a judge, when at home, can issue an order of unquestionable validity, but Admiral Carter should be forbidden to take precisely the same action as an officer of the executive rather than the judicial branch, is not reasonably explainable, I think.

The Court, indeed, has discussed the principle at issue here in the course of its opinion in the famous case of *Cunningham v. Neagle*, 135 U.S. 1, 10 S.Ct. 658, 34 L.Ed. 55 (1890) at page 56, 10 S.Ct. at 665:

> Important cases are often argued before the judge at any place convenient to the parties concerned, and a decision of the judge is arrived at by investigations made in his own room, wherever he may be, and it is idle to say that this is not as much the performance of judicial duty as the filing of the judgment of the clerk, and the announcement of the result in open court.

In *Cunningham*, the Court, without benefit of a statute, discharged from state custody the deputy marshal who was held on a state murder charge for killing an assailant apparently bent upon taking the life of Mr. Justice Field. The incident took place in the dining car of a train between Los Angeles and San Francisco while Mr. Justice Field was going from one place of holding court to another. But since, in the words of the Court, important cases may be decided in a judge's "own room" wherever he may be and this, "in the performance of judicial duty", I think "it is idle" to suggest that Admiral Carter's reprimand of the base policeman, which the majority admits would have been valid if administered in Admiral Carter's office, and pursuant to regulation, was invalid merely because it was administered in the Admiral's garden on the base at N.O.B. Norfolk. Any such decision can only serve to hamstring one of the principal officers of the United States in the performance of his duty.

ORDER

Oct. 9, 1991.

Upon a request for a poll of the court, a majority of the judges in regular active service voted to rehear this case en banc.

It is accordingly ORDERED that the opinion of the panel, decided the eighth day of July, 1991, 939 F.2d 180, shall be, and it hereby is, vacated.

It is FURTHER ORDERED that the clerk will see that the case is placed on the en banc calendar in the regular course of business.