William D. JOHNSON,
Plaintiff–Appellee,

v.

Powell F. CARTER, Defendant–Appellant,

United States of America, Appellant.

No. 90–3077.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 3, 1991.

Decided Jan. 15, 1993.

As Amended March 3, 1993.

Michael Eugene Robinson, Civ. Div., U.S. Dept. of Justice, Washington, DC, argued (Stuart M. Gerson, Asst. Atty. Gen., Barbara L. Herwig, Civ. Div., U.S. Dept. of Justice, Washington, DC, Henry E. Hudson, U.S. Atty., Norfolk, VA, Richard F. Walsh, Office of Judge Advocate General of the Navy, Alexandria, VA, on brief), for defendant-appellants.

Jeremiah A. Denton, III Virginia Beach, VA, argued, for plaintiff-appellee.

Before ERVIN, Chief Judge, RUSSELL, WIDENER, HALL, PHILLIPS, MURNAGHAN, WILKINSON, WILKINS, NIEMEYER, HAMILTON and LUTTIG, Circuit Judges, and SPROUSE, Senior Circuit Judge.

## OPINION

WIDENER, Circuit Judge:

Admiral Powell F. Carter, Jr., former Commander-in-Chief[1] of the Atlantic Fleet, appeals from the district court's decision denying his motion to substitute the United

---

**1.** At all times relevant to this dispute, Admiral Carter was the Commander-in-Chief of the At-

lantic Fleet. He retired in 1991.

States as the sole defendant under the Federal Employees Liability Reform and Tort Compensation Act of 1988 (the Westfall Act).[2] We reverse.

## I.

On June 18, 1989, Admiral Carter's daughter, Janeen Carter, visited her father at his home on the Norfolk Naval Base. When she left, her mother, Admiral Carter's wife, Carole Carter, escorted her off the base. Janeen followed in her own vehicle. William D. Johnson, a police officer patrolman at the base, pulled over Janeen Carter for speeding.[3] When Johnson requested base identification, Janeen produced a four-star placard. Carole Carter circled back behind Officer Johnson's car and got out of her car. Johnson directed Mrs. Carter back to her car. He then gave Janeen Carter a warning and sent her on her way. Janeen proceeded off the base. Johnson then went to Mrs. Carter's car and informed her that a warning had been issued to her daughter. According to Janeen and Mrs. Carter, Johnson was rude and intimidating to them during the stop. Upon her return home, Mrs. Carter told her husband what had happened and gave him the vehicle number of Officer Johnson's car.

Admiral Carter, who had been concerned about the conduct of base police officers for some time, sought to identify the officer involved so that he could file a formal complaint concerning the incident. After unsuccessfully attempting to reach the Commander of the Naval Base and the Commanding Officer of the Naval Station, Carter phoned the duty petty officer of the Naval Station and asked that the duty officer, the patrolman involved and his supervisor from the Naval Base Security Force report to his quarters so that the Admiral could identify the patrolman.

Admiral Carter was working in the garden at his home when the three officers arrived at the Admiral's house. Admiral Carter told Johnson's supervisor, Major G.K. Maynard, that something needed to be done about the discourtesy of the base police. After Maynard identified Johnson as the patrolman in question, Admiral Carter related to Johnson his wife's account of what had happened and asked Officer Johnson if he had been rude to Mrs. Carter and their daughter. Johnson replied, "No, sir." According to Officer Johnson, Admiral Carter responded, "You are a liar." The Admiral then directed Maynard to instruct Officer Johnson on how to properly conduct himself. Admiral Carter also informed Maynard that he intended to file a formal complaint against Johnson. The three officers were then dismissed.

The next day, Admiral Carter lodged a formal complaint against Officer Johnson. The incident was reported in a local newspaper, the *Virginian Pilot/Ledger Star*. Admiral Carter made no statements to the newspaper and instructed his staff not to make any comments to the press. After an investigation, the Naval Base Security Force recommended and approved a two-day suspension for Johnson. Upon arbitration at Johnson's instance, the disciplining of Johnson was affirmed, but the suspension was reduced to a letter warning.

In October 1989, Officer Johnson filed an action against Admiral Carter in the Circuit Court of the City of Norfolk, Virginia, seeking $500,000 in compensatory damages and $1,000,000 in punitive damages for slander, libel, insulting words, intentional infliction of emotional distress, and tortious interference with contractual and business

**2.** In addition, Admiral Carter appeals the district court's decision denying his motion to dismiss the case based on the military immunity doctrine set forth in *Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950). Also, Admiral Carter raises on appeal the issue that the Civil Service Reform Act (CSRA)

preempts state common law remedies for employment related activities such as this.

Because of our resolution of the Westfall Act issue, we do not decide the *Feres* or CSRA issues.

**3.** According to Johnson, his radar equipment clocked Janeen Carter at 40 m.p.h. in a 25

relations.[4] Admiral Carter then moved to have the case removed to federal district court pursuant to 28 U.S.C. § 1442 and 28 U.S.C. § 2679(d)(2) and have the United States substituted as the sole defendant.[5] The United States Attorney certified that Admiral Carter was acting within the scope of employment when the alleged torts occurred. The case was removed to the United States District Court for the Eastern District of Virginia. The district court denied the motion to substitute the United States as the sole defendant. Admiral Carter filed a renewed motion to substitute the United States as the sole defendant. The district court treated this pleading as a motion for reconsideration and denied it. Admiral Carter sought and was granted a stay of the district court's order pending resolution of the appeal.

On appeal, a divided panel of this court upheld the district court's decision. *Johnson v. Carter*, 939 F.2d 180 (4th Cir.1991). We then granted rehearing en banc and vacated the panel opinion. *Johnson v. Carter*, 939 F.2d at 191. We now reverse.

## II.

Admiral Carter argues that the United States should have been substituted as the sole defendant in the action pursuant to 28 U.S.C. § 2679(d)(1) (the Westfall Act).[6] We agree. By the plain language of 28 U.S.C. § 2679(d)(2), no discretion is given to the district court. If the Attorney General certifies that the defendant employee was acting within the scope of his employment, "the United States *shall* be substituted as the party defendant." 28 U.S.C. § 2679(d)(2) (emphasis added).

The Department of Justice, which once advocated that the Attorney General's certification was conclusive, now takes the position that the certification of scope of office or employment is reviewable. It has apparently also taken an intermediate position. *Nasuti v. Scannell*, 906 F.2d 802, 812 (1st Cir.1990). The Circuits are divided regarding this issue. The First, Third, Sixth, Seventh, Eighth, Ninth, and Eleventh Circuits follow the course taken by the district court and do not give conclusive effect to the Attorney General's determina-

---

m.p.h. zone.

**4.** Johnson subsequently reduced his claims to $60,000 in compensatory damages and $40,000 in punitive damages.

**5.** A petition for removal was filed requesting removal under "Section 1442," which was amended to claim removal under "Sections 1442a and 2679(d)(2)." Another motion moved for the substitution of the United States as the defendant instead of Admiral Carter.

**6.** The Westfall Act provides in pertinent part:

(1) Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.

(2) Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a State court

shall be removed without bond at any time before trial by the Attorney General to the district court of the United States for the district and division embracing the place in which the action or proceeding is pending. Such action or proceeding shall be deemed to be an action or proceeding brought against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant. This certification of the Attorney General shall conclusively establish scope of office or employment for purpose of removal. 28 U.S.C. § 2679(d)(1, 2).

Congress passed the Westfall Act to change the rule set out in the Supreme Court's decision in *Westfall v. Erwin*, 484 U.S. 292, 108 S.Ct. 580, 98 L.Ed.2d 619 (1988). In *Westfall*, the Court held that the judicially created doctrine of official immunity did not provide blanket protection to government employees for torts committed in the scope of their employment. The Westfall Act grants immunity to government employees acting within the scope of their employment by requiring persons injured by them to substitute the government as the defendant. The remedy against the government is exclusive. Any other civil action or proceeding for money damages against the employee, arising out of or relating to the same subject matter with two exceptions not relevant here, is precluded. 28 U.S.C. § 2679(b).

tion.[7] These courts base their decisions, in part, on legislative history and what they perceive as ambiguity in the statute. 28 U.S.C. § 2679(d)(2), the portion of the Westfall Act dealing with cases commenced in the state courts, concludes by providing that "certification of the Attorney General shall conclusively establish scope of office or employment for purposes of removal." There is no similar provision in 28 U.S.C. § 2679(d)(1), the portion of the Act dealing with cases commenced in the federal courts. Upon this claimed ambiguity,[8] the court typically would then look to the legislative history and find that Congressman Frank, the Act's sponsor, stated that "the plaintiff would still have the right to contest the certification if they [sic] thought the Attorney General were [sic] certifying without justification." *Legislation to Amend the Federal Tort Claims Act: Hearing Before the Subcommittee on Administrative Law and Governmental Relations of the Committee on the Judiciary,* 100th Cong., 2d Sess. 60, 128 (April 14, 1988), cited in *Meridian Int'l Logistics, Inc. v. United States,* 939 F.2d at 744. In addition, the court would rely upon a Department of Justice representative, Deputy Assistant Attorney General Robert Willmore, who appeared at a Congressional hearing and stated that "Chairman Frank is correct that a plaintiff can challenge that certification. So that would be reviewable by a court at some point, probably by a Federal District Court." *Legislation to Amend the Federal Tort Claims Act: Hearing,* at 133, cited in *S.J. & W. Ranch, Inc. v. Lehtinen,* 913 F.2d at 1541. The Fifth and Tenth Circuits, however, follow Congress's express language instead of the legislative history and give conclusive effect to the Attorney General's certification. See *Mitchell v. Carlson,* 896 F.2d 128 (5th Cir.1990); *Aviles v. Lutz,* 887 F.2d 1046 (10th Cir.1989).

■ We are of opinion that the district court erred in not giving conclusive effect to the Attorney General's scope certification. We do not agree with the Department of Justice's latest position and, with respect, with those courts which rely on legislative history in determining that the Attorney General's scope certification is not conclusive. We are of opinion that "[l]egislative history is irrelevant to the interpretation of an unambiguous statute." *Davis v. Michigan Dep't of Treasury,* 489 U.S. 803, 808–09 n. 3, 109 S.Ct. 1500, 1504 n. 3, 103 L.Ed.2d 891 (1989). As we have recently stated,

> Congress enacted [the statute], not its accompanying legislative reports. We have no authority to limit the scope of a clear statutory term by recourse to the views of a legislative subgroup.

*In re Moore,* 907 F.2d 1476, 1479 (4th Cir. 1990). In the instant case, the language of the statute is clear and unambiguous. If the Attorney General certifies that the de-

---

**7.** See *Brown v. Armstrong,* 949 F.2d 1007 (8th Cir.1991); *Meridian Int'l Logistics, Inc. v. United States,* 939 F.2d 740 (9th Cir.1991); *Hamrick v. Franklin,* 931 F.2d 1209 (7th Cir.1991), cert. denied, —— U.S. ——, 112 S.Ct. 200, 116 L.Ed.2d 159 (1991); *S.J. & W. Ranch, Inc. v. Lehtinen,* 913 F.2d 1538 (11th Cir.1990), modified, 924 F.2d 1555 (11th Cir.), cert. denied, —— U.S. ——, 112 S.Ct. 62, 116 L.Ed.2d 37 (1991); *Melo v. Hafer,* 912 F.2d 628 (3d Cir.1990), *aff'd on other grounds,* —— U.S. ——, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991); *Nasuti v. Scannell,* 906 F.2d 802 (1st Cir.1990); *Arbour v. Jenkins,* 903 F.2d 416 (6th Cir.1990).

Some of these courts believed there would be potential separation of powers problems if the Attorney General's scope certification was given conclusive effect. We do not agree.

We have held that, over like objections, in ordinary circumstances, a reduction in sentence for assisting the government can only occur upon motion of the government as stated in the sentencing guidelines. *United States v. Francois,* 889 F.2d 1341 (4th Cir.1989), cert. denied, 494 U.S. 1085, 110 S.Ct. 1822, 108 L.Ed.2d 951 (1990). We found no separation of powers problem with vesting absolute discretion in the prosecutor in deciding whether to file a motion or not in the more compelling circumstance of assertion of a criminal defendant's rights, so it follows that the same objection should be held without merit in the context of a civil case.

**8.** A logical flaw in that reasoning is at once apparent. Section (d)(1) does not deal with removals, so it has nothing to do with cases filed in the state court. Also, cases filed in the federal courts, of course, require no removal. In the same vein, we do not agree with the reasoning of the court which found the "plain language" of § 2679 "comports" with non-reviewability, *Brown* at 1011, but then found the statute ambiguous.

fendant employee was acting within the scope of his employment, "the United States *shall* be substituted as the party defendant." 28 U.S.C. § 2679(d)(2) (emphasis added). That language, we suggest, is hardly ambiguous.

### III.

■ In any event, even if the certification should not be conclusive in all cases (which we do not intimate), it must be treated as conclusive in a case such as this where a military officer is inquiring into a report to him concerning improper performance of duty. The manner in which Admiral Carter performed his duty should not be subject to review by a civil court under the Westfall Act upon proper certification, as here, and that is what the Westfall Act is all about. We are of opinion that it should be, and it is, entirely within the province of Congress to provide, as it has, that the employment of certain officers and servants of the United States, such as Admiral Carter, is of such importance to the nation that their acts within the scope of their office or employment are shielded from liability unless Congress has specifically provided otherwise. It is entirely within the province of Congress to provide that the certification of the Attorney General conclusively establishes not only the scope of office or employment for the purposes of removal but also conclusively establishes that "[u]pon certification" "such action" "shall be deemed to be an action ... brought against the United States." 28 U.S.C. § 2679(d)(2). In addition, it is well within Congress's power to provide, as it has, that "[a]ny other civil action or proceeding [except under § 1346(b) and § 2672] for money damages arising out of or relating to the same subject matter against the employee or the employee's estate is precluded without regard to when the act or omission occurred." 28 U.S.C. § 2679(b)(1).

An analogy close to home illustrates the point. 28 U.S.C. § 452 provides that the courts of the United States will always be in session.

There is hardly a lawyer who has not in practice applied for and received injunctive or other like extraordinary relief from a judge, state or federal, at his home, and not on the bench or in his office. The hour of the day or night does not make a difference, nor do Saturdays, Sundays, or holidays, as we all know. A judge, when at home, can issue an order of unquestionable validity. In *Cunningham v. Neagle*, 135 U.S. 1, 10 S.Ct. 658, 34 L.Ed. 55 (1890), the Supreme Court discussed the principle at issue here.

> Important cases are often argued before the judge at any place convenient to the parties concerned, and a decision of the judge is arrived at by investigations made in his own room, wherever he may be, and it is idle to say that this is not as much the performance of judicial duty as the filing of the judgment with the clerk, and the announcement of the result in open court.

135 U.S. at 56, 10 S.Ct. at 665. The Court, without benefit of a statute, discharged from state custody the deputy marshal who was held on a state murder charge for killing an assailant apparently bent upon taking the life of Mr. Justice Field. The incident took place in a railroad restaurant for a train between Los Angeles and San Francisco while Mr. Justice Field was going from one place of holding court to another. But since, in the words of the Court, important cases may be decided in a judge's "own room" wherever he may be and this, "in the performance of judicial duty", the Court held that Mr. Justice Field was engaged in the discharge of his judicial duties, 135 U.S. at 58, 10 S.Ct. at 666, when the deputy marshal, who was charged with the duty of protecting and guarding the Justice, killed the assailant. 135 U.S. at 69, 10 S.Ct. at 670.

Clearly then, Admiral Carter, as an officer of the executive branch, can take precisely the same action as can officers of the judicial branch. Admiral Carter's reprimand, which indisputably would have been valid if administered during the work week, in Admiral Carter's office and pursuant to regulation, as the panel majority freely admits at 939 F.2d at 185, is not invalid

merely because it was administered in the Admiral's garden at Norfolk Naval Base. A decision to the contrary would serve to hamstring one of the principal officers of the United States in the performance of his duty.

## IV.

■■■ In any event (and again assuming that the scope of employment certification is reviewable, which we do not intimate), the district court erred in concluding that Admiral Carter's actions were outside the scope of employment. The determination of whether an employee's actions were within the scope of employment is to be determined according to the *respondeat superior* rules of the State, in this case Virginia, in which the alleged tort occurred. *Williams v. United States*, 350 U.S. 857, 76 S.Ct. 100, 100 L.Ed. 761 (1955) (per curiam); *Brown v. Armstrong*, 949 F.2d 1007, 1012 n. 7 (8th Cir.1991). In Virginia, once the employment relationship has been established (and it is conceded here), the party opposing a finding of *respondeat superior* has the burden of proving the employee was outside of the scope of employment when the incident occurred. See, e.g., *Slaughter v. Valleydale Packers, Inc.*, 198 Va. 339, 343–44, 94 S.E.2d 260, 263–64 (1956); *Alvey v. Butchkavitz*, 196 Va. 447, 453, 84 S.E.2d 535, 539 (1954) ("We have repeatedly held that where the relationship of master and servant has been established the burden is on the master to prove that the servant was not acting within the scope of his employment when he committed the act complained of ..."); *Crowell v. Duncan*, 145 Va. 489, 501, 134 S.E. 576, 579 (1926) ("Where it is doubtful whether a servant in injuring a third person was acting within the scope of his authority, the doubt will be resolved against the master...."). Admiral Carter established that he was employed by the United States. Therefore, the burden was on Johnson to prove that Admiral Carter's actions were outside of the scope of employment. In not applying Virginia law as just stated, to place the burden of proof on Johnson, the district court erred.

In Virginia an act is deemed to be within the scope of employment if:

(1) it was expressly or impliedly directed by the employer, or is naturally incident to the business, and

(2) it was performed, although mistakenly or ill-advisedly, with the intent to further the employer's interest, or from some impulse or emotion that was the natural consequence of an attempt to do the employer's business, "and did not arise wholly from some external, independent, and personal motive on the part of the [employee] to do the act upon his own account."

*Kensington Assoc. v. West*, 234 Va. 430, 432, 362 S.E.2d 900, 901 (1987) (citations omitted).

■■■ It cannot be said from anything in this record that Admiral Carter's summoning of a base police officer arose "wholly from some external, independent, and personal motive" on his part. Undisputed contemporaneous written records corroborate that Admiral Carter had previously and consistently expressed his displeasure with the conduct of the base police, and that he took action to remedy the situation. Upon taking command of the Atlantic Fleet, Admiral Carter became aware of problems with the quality of life of naval personnel on the bases around Norfolk and attempted to improve the situation. The conduct of the base police had been a concern of his for quite some time. As early as November 16, 1988, he expressed his concerns to Rear–Admiral Pappas about reports he had heard concerning rude conduct by base police. He expressed those concerns on numerous occasions. On November 22, 1988, Admiral Carter noted that Rear Admiral Pappas "[t]old me results [of] looking into discourtesy.... Stories on police hard to pin down. Not many H.L. complaints. People may feel its their word against police so its no use." On February 2, 1989, Carter noted that he had told Pappas that "MG Doran USAF is *another* who has had probs w/police discourtesy to his guests on base. Realize *many* of police are great, but evidence is there are a few out of line. Need identify + correct." (italics in origi-

nal) Carter's notes indicate an increasing level of frustration with the inability to correct the problems of police rudeness because of difficulties in identifying the personnel who were causing the problems. Therefore, it is not surprising that he took direct and immediate action when his wife was able to identify a policeman who had acted rudely.

■ The district court gave great weight to the fact that the incident occurred while Admiral Carter, dressed in civilian clothes, was working in his garden. Where and when Admiral Carter exercises his authority are of no moment, however. By Navy Regulations, Admiral Carter, while on active service, is "at all times subject to naval authority" and "may ... exercise authority over all persons who are subordinate to [him]." 32 C.F.R. § 700.811(a) (1990). Therefore, Admiral Carter had the authority to summon a base police officer at any time. If he so chose, Admiral Carter could direct movements of the Atlantic Fleet from his garden, dressed in civilian clothing. His attire and location do not determine whether his acts were within the scope of his authority. He patently had the authority to summon Johnson to his home and he exercised that authority.

■ The alleged tortious incident cannot be looked at in isolation from the context in which it occurred. As we stated in *Wallen v. Domm*, 700 F.2d 124 (4th Cir.1983), a pre-Westfall Act common law immunity case:

> Few government authorities are authorized to commit torts as part of their line of duty, but to separate the activity that constitutes the wrong from its surrounding context—an otherwise proper exercise of authority—would effectively emasculate the immunity defense. Once the wrongful acts are excluded from an exercise of authority, only innocuous activity remains to which immunity would be available. Thus, the defense would

apply only to conduct for which it is not needed.

700 F.2d at 126. We also made clear that "[a]pplication of the immunity is not affected by whether the injury was committed in good faith, negligently, or even intentionally." 700 F.2d at 126.

■ The district court "found it incredible that the United States Attorney could make an affidavit that the words of the Admiral that the policeman who had stopped the Admiral's daughter for speeding was 'a liar,' were words spoken while the Admiral was acting within the scope of his employment as an employee of the United States." But the district court erroneously looked at the words spoken in isolation from the surrounding acts. As *Wallen* makes clear, the appropriate question is, was the underlying conversation between Johnson and Admiral Carter "an otherwise proper exercise of authority" by Admiral Carter, not whether Admiral Carter spoke improperly during the conversation.

In *Barr v. Matteo*, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), the Supreme Court stated it is "the relation of the act complained of to 'matters committed by law to his control or supervision'—which must provide the guide in delineating the scope of the rule which clothes the official acts of the executive officer with immunity from civil defamation suits." 360 U.S. at 573–74, 79 S.Ct. at 1341 (citation omitted). Control of the base policies was a matter committed by law to Admiral Carter's control or supervision, therefore, his activities with respect to this were within the scope of his employment.

The district court also erred in holding that "to substitute the United States as the sole defendant, and to then dismiss the plaintiff's claims ... [would] completely ignore any semblence [sic] of constitutional 'due process' to the plaintiff on his claim of alleged slander and libel." [9] The Supreme

---

**9.** The United States has not waived its sovereign immunity in defamation actions. Therefore, if the government is substituted as the sole defendant judgment must be entered against the plaintiff. 28 U.S.C. § 2620(h).

*Smith*, we note, was decided after the district court's decision.

Court, in *United States v. Smith,* ––– U.S. –––, 111 S.Ct. 1180, 113 L.Ed.2d 134 (1991), while it did not phrase its reasoning in constitutional terms, expressly rejected recovery on that very account and held that government employees are immunized from suit "even when an FTCA exception precludes recovery against the Government." ––– U.S. at –––, 111 S.Ct. at 1182.

This case involves much more than merely the construction of the federal statute and the Virginia law on scope of employment. It has to do with the ability and obligation of one of the principal officers of the United States to perform his duty unhampered by having to answer for the same in a civil court. No one can seriously contend that Admiral Carter would not have the authority to order the movement of ships and aircraft from the same garden involved here (which is owned by the government) at the Norfolk Naval Base at any hour of the day or night, on any day of the week, for, pursuant to Navy Regulations "while on active service" he might "exercise authority over all persons who are subordinate" to him. It is just as true that Admiral Carter had authority over the base policeman of Norfolk Naval Base who is involved in this case. This is not contested and is acknowledged in the decision of the district court. Since Admiral Carter had authority to control the base policeman in the performance of his (Admiral Carter's) duty, then he had the authority to perform that duty other than in a manner entirely in accord with public sensibilities (even if the words charged were uttered, which is admitted for argument.)

We are of opinion and so hold that Admiral Carter was acting within the scope of employment when the incident occurred.

The district court erred in holding to the contrary.

Accordingly, the decision of the district court appealed from must be reversed, and the case remanded with instructions to substitute the United States as the party defendant and then to enter judgment in the case in favor of the United States, it not having waived its sovereign immunity for this type of claim.

REVERSED AND REMANDED WITH INSTRUCTIONS.

SPROUSE, Senior Circuit Judge, dissenting:

I respectfully dissent.

**I**

My strongest disagreement with the majority opinion is with its holding that the Attorney General's certification of scope of employment for purposes of substituting the United States as the defendant is conclusive, and thus defies judicial review. My view is influenced to a degree by concessions by the Department of Justice on behalf of Admiral Carter that the certification is subject to review by United States district courts. I also find precedent from seven United States courts of appeal to that same effect persuasive.[1] Even apart from this overwhelming precedential support, I cannot conclude from an objective analysis that Congress, when enacting 28 U.S.C. § 2679(d)(2), intended to interfere with the judiciary's prerogative to decide questions of jurisdiction. To me, it is disturbing that the majority opinion denies to courts the authority to review decisions of the executive branch's legal office—particularly where, as here, its decisions determine litigation in which it is an interested

---

1. *Brown v. Armstrong,* 949 F.2d 1007, 1010–11 (8th Cir.1991); *Meridian Int'l Logistics, Inc. v. United States,* 939 F.2d 740, 743–45 (9th Cir. 1991); *Hamrick v. Franklin,* 931 F.2d 1209, 1210–11 (7th Cir.), *cert. denied,* ––– U.S. –––, 112 S.Ct. 200, 116 L.Ed.2d 159 (1991); *S.J. & W. Ranch, Inc. v. Lehtinen,* 913 F.2d 1538, 1540–42 (11th Cir.1990), *modified,* 924 F.2d 1555 (11th Cir.), *cert. denied,* ––– U.S.–––, 112 S.Ct. 62, 116 L.Ed.2d 37 (1991); *Melo v. Hafer,* 912 F.2d 628, 640–42 (3d Cir.1990), *aff'd on other grounds,* –––

U.S. –––, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991); *Nasuti v. Scannell,* 906 F.2d 802, 812–13 (1st Cir.1990); *Arbour v. Jenkins,* 903 F.2d 416, 421 (6th Cir.1990).

Two circuits, which decided the question earliest (one before the Department of Justice acknowledged its current position), have held to the contrary. *Mitchell v. Carlson,* 896 F.2d 128, 136 (5th Cir.1990); *Aviles v. Lutz,* 887 F.2d 1046, 1048–49 (10th Cir.1989).

party. Quite apart from possible constitutional problems of separation of powers and due process, which, in my opinion, the majority has too quickly dismissed, all of the traditional interpretive tools point to the conclusion that Congress intended in 28 U.S.C. § 2679(d)(2) to avoid this unsavory appearance of unfairness by subjecting the Attorney General's certification to judicial review.

## A

In the first place, the the unambiguous language of the statute should dispose of the question. Section 2679(d)(1) applies to cases filed in federal district courts, while section (d)(2) applies to those filed in state courts. *Both* sections provide: "Upon certification ... the United States *shall* be substituted as the party defendant" (emphasis added). In addition, section (d)(2) provides: "Upon certification ... [the claim] *shall* be removed ... to the district court" (emphasis added). Thus, in federal cases the result of certification is substitution, while in state cases it is substitution plus removal. Notably, the only mention of *nonreviewability* pertains to removal: "The certification of the Attorney General shall conclusively establish scope of office or employment *for purposes of removal.*" 28 U.S.C. § 2679(d)(2) (emphasis added). Clearly, then, only certification for purposes of removal is nonreviewable; certification for purposes of substitution remains subject to judicial review.

There are only two ways to view the majority's reading of this language. One interpretation is that they have added words to the sentence to make it read: "The certification of the Attorney General shall conclusively establish scope of office or employment for purposes of removal *and for purposes of substitution.*" Alternatively, they have interpreted "shall" in "shall be substituted" and "shall be removed" as meaning "nonreviewable," thereby rendering the last sentence of (d)(2) superfluous and meaningless.

## B

It is apparent from the unambiguous language of the statute that the majority's interpretation is wrong. Even if the language were equivocal, however, and an examination of legislative history and congressional intent were required, my conclusion would be the same. Congressional rationale in differentiating between the effect of certification as it relates to removal, on the one hand, and its effect on substitution, on the other, was pointed out by the Eighth Circuit in *Brown v. Armstrong,* 949 F.2d 1007 (8th Cir.1991). The court noted that substitution will often end the plaintiff's case—as it will here. However, "[t]he same concerns do not exist with automatic removal, which changes only the forum and not the substance of the case." *Id.* at 1011. The Third Circuit has explained the significant policy reasons for Congress to give the government an unchallenged right to a federal forum for tort suits brought against its employees (removal), while noting that no similar policy reasons exist for making the Attorney General's substitution decision unreviewable.

Historically, the government has generally preferred to have litigation which it or its employees are defending in the neutral confines of federal courts. For example, a similarly "absolute" right of removal is provided by 28 U.S.C. § 1442(a)(1) whenever a suit against a United States officer is filed in a state court for any act "under color of [federal] office" because, as the Supreme Court has explained, "Congress has decided that federal officers, and indeed the Federal Government itself, require the protection of a federal forum." *Melo v. Hafer,* 912 F.2d 628, 641 (3d Cir.1990) (quoting *Willingham v. Morgan,* 395 U.S. 402, 407, 89 S.Ct. 1813, 1816, 23 L.Ed.2d 396 (1969)), *aff'd on other grounds,* — U.S. —, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991).

This reasoning, and other rationale supporting a holding that certification is conclusive for purposes of removal but judicially reviewable for purposes of substitution, are not novel. It has been the position of the Department of Justice at least

since early 1990,[2] and represents the opinion of seven of the nine federal courts of appeals entertaining the issue. Perhaps the most comprehensive discussion is found in the Eleventh Circuit's 1990 decision in *S.J. & W. Ranch, Inc. v. Lehtinen*, 913 F.2d 1538, 1540–42 (11th Cir.1990), *modified*, 924 F.2d 1555 (11th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 62, 116 L.Ed.2d 37 (1991). *Lehtinen* exhaustively expresses the rationale of the majority of other circuits:

> Our review of this [legislative history of § 2679(d)(2)] persuades us that the district court's interpretation was in error. During the hearings before the House Subcommittee on Administrative Law and Governmental Relations of the Committee on the Judiciary, Subcommittee Chair Frank, a sponsor of the bill, expressed his understanding that under section 2679(d)(2) a "plaintiff can still contest the certification...." *See Arbour v. Jenkins*, 903 F.2d 416, 421 (6th Cir.1990). Representative Frank elaborated:
>
> > I mean that [this bill] is not going to void the [certification] litigation. It seems to me the certification is a weapon against the employee, not against the plaintiff, because *the plaintiff would still have the right to contest the certification if they thought the Attorney General were certifying without justification.*
>
> This understanding of the bill was reiterated in a colloquy with Lois Williams, Director of Litigation at the National Treasury Employees Union.
>
> > Frank: [E]ssentially the judge is deciding the case. One of the issues for the judge is going to be to decide [certification] ... because you might have a third route. It is conceivable—I cannot think of too many cases—where the plaintiff might not want the Government in there.
> >
> > Williams: That is right.
> >
> > Frank: So the plaintiff might object to the argument and the Government

might certify. But that would not be binding on the plaintiff. The plaintiff would, I assume, have the right to go into court and say, baloney, it was not within the scope of employment, either because of some immunity issue or because you really hated that defendant and you wanted to get them.

> > Williams: Yes. In fact, that is the way it frequently has arisen in the past.
>
> Representative Frank's understanding that the certification issue would be subject to judicial review was shared not only by Williams, but also by a representative of the Justice Department, Deputy Assistant Attorney General Robert Willmore, as is evidenced by the following exchange:
>
> > Frank: Well, but the plaintiff can still contest the certification, could he not?
> >
> > Willmore: Yes.
>
> *See Arbour*, 903 F.2d at 421. Later during the hearing, Willmore reiterated: "Chairman Frank is correct that a plaintiff can challenge that certification. So that would be reviewable by a court at some point, probably by a Federal District Court." We agree. The legislative history of the certification provision of the Reform Act coupled with the language of the statute itself persuades us that the Attorney General's scope certification is pertinent and dispositive only for removal purposes.
>
> Our interpretation of the statute is supported by several additional considerations. First, separation of powers concerns.... As the First Circuit cogently noted, "it is hard to imagine Congress empowering an executive officer, the Attorney General of the United States, to displace the federal court as the final determiner of the scope of employment question, thus forcing a federal court to forego determination of its own jurisdiction, and preventing the plaintiff, by executive fiat, from pursuing a possibly legitimate claim in state court." *Nasuti*

**2.** *See Petrousky v. United States,* 728 F.Supp. 890, 891 (N.D.N.Y.1990) (discussing new Department of Justice guidelines).

*v. Scannell,* 906 F.2d 802, 812 (1st Cir. 1990).

Moreover, the statutory interpretation urged by defendant Lehtinen is particularly suspect because it leaves the determination of a dispositive issue in FTCA cases to an interested party.... We do not believe Congress intended to entrust the party responsible for providing the federal employee's defense with the power to make a scope determination that will have the result of dismissing the plaintiff's suit for lack of jurisdiction. *Nasuti,* 906 F.2d at 812–13.

. . . . .

We are also cognizant of the due process implications inherent in treating the Attorney General's scope certification as dispositive. We share the First Circuit's observation that nothing in the regulations governing scope certifications requires the Attorney General "to conduct a neutral proceeding, open to all parties, before taking a final position on the scope question...."

Finally, whether an employee's actions are within the scope of his employment for purposes of the Reform Act is an issue governed by the law of the state where the incident occurred. *Nasuti,* 906 F.2d at 805 n. 3; *Arbour,* 903 F.2d at 421–22. Because this determination involves a question of law as well as fact, it is reasonable to assume that Congress entrusted the authoritative disposition of this question to the judicial rather than the executive branch.

*Lehtinen,* 913 F.2d at 1541–42 (some citations omitted) (emphasis added by *Lehtinen* court).

As I have indicated, six circuits in addition to the Eleventh, employing similar rationales, have reached the same conclusion. The First Circuit in *Nasuti* added:

Even without that [legislative history of the Westfall Act], it is hard to imagine Congress empowering an executive officer, the Attorney General of the United States, to displace the federal court as

the final determiner of the scope of employment question, thus forcing a federal court to forego determination of its own jurisdiction, and preventing the plaintiff, by executive fiat, from pursuing a possibly legitimate claim in state court. Especially is this unlikely given the Attorney General's interested relationship to the case. It is his responsibility to represent and protect the interests of the United States and of the defendant employee, *see* 28 U.S.C. § 2679(c). There is no suggestion that the Attorney General is to conduct a neutral proceeding, open to all parties....

*Nasuti v. Scannell,* 906 F.2d 802, 812 (1st Cir.1990).

In short, my view is that the unambiguous language of section 2679(d)(2) provides that certification is conclusive for purposes of removal, but reviewable for purposes of substitution. Even if the language were ambiguous, however, I would reach the same result. Congressional intent and legislative history, as explained previously by other circuits and reiterated here, make that conclusion inescapable.

### C

As I understand part III of the majority opinion, it would, quite apart from the above analysis, create a subset of cases (such as this one) concerning any high military officer "inquiring into a report to him concerning improper performance of duty." Op. at 1321. Regardless of whether the executive or the judicial branch is the ultimate judge of the scope of employment question, holding Admiral Carter accountable would not, as the majority suggests, hamstring "one of the principal officers of the United States" in the performance of his duties. Op. at 1324. Carter could be held liable only .if he acted *outside of* the performance of his duties. Moreover, section 2679(d)(2) is not directed at preserving discipline in the military. It grants protection to *all* federal employees.[3] There is no

---

**3.** "Federal agency" includes the executive departments, the judicial and legislative branches, the military departments....

"Employee of the government" includes officers or employees of any federal agency, members of the military or naval forces of the

difference in principle between applying the statute to the improper action of a four-star admiral and applying it to the improper action of a mid-level supervisor of postal employees.

The majority nonetheless expresses concern that permitting judicial review of this military officer's civil tort might somehow affect national security. They go to some length to point out that Admiral Carter could direct movements of the Atlantic Fleet from his garden while dressed in civilian clothes and be well within the scope of his authority. They conclude that this case involves more than the mere construction of a federal statute and the Virginia law on scope of employment.

> It has to do with the ability and obligation of one of the principal officers of the United States to perform his duty unhampered by having to answer for the same in a civil court. No one can seriously contend that Admiral Carter would not have the authority to order the movement of ships and aircraft from the same garden involved here (which is owned by the government) at the Norfolk Naval Base at any hour of the day or night, on any day of the week. . . .

Op. at 1324.

We all fervently hope, of course, that if this country were to fall under surprise nuclear attack or suffer an invasion or other military crisis, the Admiral and all of our other military servants would respond from whatever geographical and physical positions they occupied at the time. In my view, however, this hardly equates with the situation in which an officer, enjoying one of the highest honors and offices that our nation can bestow, uses the prerogatives of his position to vindicate a personal peeve— as the district court concluded. Even viewing the case in a purely military context, as does the majority, I agree that it involves more than merely the construction of feder-

al and state laws. It should demonstrate our most basic principle—that, even recognizing the rare exceptions implicit in critical national emergencies, the law operates on all citizens equally.

### D

The majority draws an analogy between the actions of high-ranking military officials and the conduct of judges entertaining petitions for relief while at home or in other nonjudicial locations. I have no quarrel with the thesis that both judicial officers and military officers at times must respond to emergencies while in locations other than their official stations. I think, however, that this analogy misses the mark by a wide margin. None of us would suggest that a judge could summon a litigant on the streets or in a social hall and administer judicially because of some personal whim or caprice. Nor should a judge be immune from liability for sexual harassment, whether it occurs on or off judicial premises, or for unduly chastising a parking lot attendant or custodial employee. There should be no question that a judicial officer would be denied immunity from suit over such nonjudicial derelictions.[4] For the same reasons, a military officer should be denied immunity from civil action by a civilian policeman who sues over tortious conduct by the officer, brought on by an allegation from the officer's wife that the policeman was rude. Although the treatment afforded Officer Johnson was considerably short of a flogging, it was unbecoming to an officer of Admiral Carter's high rank and, to say the least, was not in the Navy tradition of *noblesse oblige*.

### E

It may be that an authoritative and elitist rule completely immunizing high-ranking military officials for any and all tortious conduct toward subordinates would create

---

United States, members of the National Guard while engaged in training or duty . . ., and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation.
28 U.S.C. § 2671.

4. Regrettably, the majority opinion shadows this principle with doubt, since the Westfall Act applies to judicial (and executive and legislative) employees as well as military employees. 28 U.S.C. § 2671.

a better and more disciplined military. A more egalitarian approach to military discipline in a democratic country is at least equally tenable. Despite the temptation to engage in tangential, philosophical concerns, however, the legal issue we review is not about the military. Nor is it about libel, or whether Mrs. Carter or Officer Johnson is lying. The issue we review is about a federal law enacted to protect the efficiency of federal employees' performances.

Focused in this fashion, I view the implications of our decision in a perspective different from the majority's. Even aside from possible constitutional concerns, it is hard for me to fathom that Congress would grant the executive branch the authority to protect from liability under any and all circumstances officials, military or otherwise, who have violated our civil laws. I believe Congress intended that a principal officer of the United States, no matter how high his position, must, in fact, be "hampered" by having to answer for civil transgressions in civil court if he acts outside the scope of his authority, and that the jurisdiction to decide the ultimate question of authority rests with the judiciary.

## II

Although review of the Attorney General's certification on substitution is necessary only if certification *is reviewable,* the majority nonetheless engages in that analysis in part IV of its opinion. Like its holding on the reviewability question, I believe the majority's conclusion that Admiral Carter's actions fell within the scope of his employment is also faulty.

The district court held that Admiral Carter acted outside the scope of his military employment when the incident at issue occurred. The majority correctly notes that in FTCA cases the determination whether an employee's actions are within the scope of employment is to be made under the law of the state in which the tort occurred—in this case, Virginia. Contrary to the majority, however, I think application of Virginia law to the facts here requires affirmance of the district court's holding that Carter

acted outside the scope of his employment. We, of course, consider *de novo* the district court's application of the Virginia law. Although the record presents us with significant factual disputes, we must affirm the district court's factual findings unless they are clearly erroneous.

Only three people witnessed the traffic encounter: Officer Johnson, the plaintiff; Carole Carter, the Admiral's wife; and Janeen Carter, the Admiral's daughter. The two women's story differed critically from Johnson's. Admiral Carter, perhaps understandably, chose the version offered by his wife and daughter without investigating or inquiring into the possibility that Johnson was correct. Mrs. Carter stated that her daughter was traveling 23 miles per hour; Johnson clocked her at 40 miles per hour. Mrs. Carter said that Johnson was rude and discourteous; he stated that he was professional and courteous. They also differed in their accounts of the actual words that passed between them.

Relevant is the discrepancy between the view of Admiral Carter concerning his encounter with Johnson at his home and the version offered by independent witnesses. Carter testified in his deposition that he did not send for Johnson but merely for his superiors, and that he did not address Johnson initially but spoke to him only after he was identified. Major Maynard wrote that when he, Navy Lt. Irene Glass (the Naval Station command duty officer), and Johnson reported to Carter, the Admiral

> stated that the speeding ... was really not his concern at that moment. He was really concerned about the way the officer treated his daughter. He then stated that when his daughter showed officer Johnson his placard with the stars on it, officer Johnson stated that those stars don't give you the right to speed or break any other laws on this base. He then continued by stating that when his wife came back and was getting out of her vehicle, officer Johnson yelled at her to get back in her vehicle. He then asked officer Johnson if that was not true? Officer Johnson said "no sir". Admiral Carter then called officer John-

son a liar.... He then stated that he had a lot of people working for him including Jimmy Pappas [the base commander], and that he was going to have the whole incident investigated.

Admiral Carter also insisted in his deposition that he was not really angry but only agitated, whereas Lt. Glass testified that the Admiral told Major Maynard "he could have him fired, be replaced." She then testified that Carter did not ask Johnson if he had been rude to his wife or daughter (as the Admiral testified in deposition); rather, he told Johnson he had been rude: "I recall generally [Carter] telling [Johnson] that he was disrespectful, or rude to [Mrs. Carter]. He didn't ask him." Lt. Glass also testified that Admiral Carter told Johnson he was not doing his job and said, in effect, that Johnson had treated his wife and daughter like common criminals. Finally, she testified that Admiral Carter "appeared upset" and that she could tell this from "[t]he tenor of his voice, his posture.... He was using controlled anger."

In my view, these facts, which the district court interpreted by crediting Johnson's version, are critical to our review. To invoke Virginia's law of *respondeat superior*, the employee's act must be fairly and naturally incident to the employer's business, be done while the employee was engaged in the employer's business, and be done with a view to further the employer's interests. *Roughton Pontiac Corp. v. Alston*, 236 Va. 152, 372 S.E.2d 147, 149 (1988); *United Bhd. of Carpenters v. Humphreys*, 203 Va. 781, 127 S.E.2d 98, 102 (1962), *cert. denied*, 371 U.S. 954, 83 S.Ct. 509, 9 L.Ed.2d 501 (1963). Scope of

employment is determined from the surrounding circumstances, including character of the employment, nature of the wrongful deed, time and place of its commission, and the purpose of the act. *See, e.g., Abernathy v. Romaczyk*, 202 Va. 328, 117 S.E.2d 88, 92 (1960) (declaring scuffle an independent venture to gratify personal feelings); *Bryant v. Bare*, 192 Va. 238, 64 S.E.2d 741, 747 (1951) (holding within scope an accident occurring when employee had, after earlier detour, proceeded on highway as instructed); *Appalachian Power Co. v. Robertson*, 142 Va. 454, 129 S.E. 224, 227–28 (1925) (holding outside scope a courtesy performed for third person during meal hour off work premises); *Drake v. Norfolk Steam Laundry Corp.*, 135 Va. 354, 116 S.E. 668, 670 (1923) (holding within scope an employee's going out of way for own purposes on an errand that began and was to end in service of employer).

Carter cites naval regulations detailing the duties of naval commanders—in particular, the Commander-in-Chief of the United States Atlantic Fleet.[5] Specifically, Carter argues that general supervision of base security forces, including the supervision of motor vehicle traffic, is among his responsibilities.[6]

Johnson also relies on naval regulations to support his contrary contention—that Carter acted outside the scope of his employment. He particularly stresses Navy regulation 721.18, which prohibits a military officer from participating in any action that has the appearance of a conflict of interest.[7] Johnson also cites regulations that prohibit tyrannical behavior and abusive language in dealings with subordinates,[8] and proscribe the use of insulting

---

**5.** 32 C.F.R. §§ 700.309(a), 700.602(a), 700.-602(d).

**6.** OPNAVINST 5530.14B at ¶ 5.c; *id.* 11200.5C at ¶¶ 1–4.b(1), 4.3.a(3). OPNAVINST is the code of instructions promulgated by the Chief of Naval Operations.

**7.** 32 C.F.R. § 721.18(b)(4) and (d) provide that a naval officer must ...

    (b) [a]void any action, whether or not specifically prohibited, which might result in or reasonably be expected to create the appearance of

    ....

    (4) [l]osing complete independence or impartiality,

    ....

    (d) ... not engage in any activity that might result in or reasonably be expected to create the appearance of a conflict of interest.

**8.** Navy regulations, article 0814 provides:

    Persons in authority are forbidden to injure their subordinates by tyrannical or capricious conduct, or by abusive language.

or defamatory language in general.[9] Johnson contends that when Carter violated these regulations, he did so "upon his own responsibility."[10]

In my view, consideration of the cited naval regulations alone presents a close question whether Carter's actions were incident to his employer's business. Assuming, however, that the regulations cited by Carter vested him with authority, and that it was not vitiated by the conflict-of-interest regulations, there remains the question under Virginia law whether he acted with the *purpose* of fulfilling these responsibilities as a naval commander, or for personal reasons. In this context, Carter argues that a mixed personal/official motive would show that his actions fell within the scope of his employment, pursuant to a "dual purpose doctrine." Although Carter cites *Kensington Associates v. West*, 234 Va. 430, 362 S.E.2d 900 (1987), for this proposition, *Kensington* does not create such a doctrine.

In *Kensington*, the Virginia Supreme Court found that conduct prohibited by an employer may be activity outside the scope of employment. *Id.*, 362 S.E.2d at 903–04. At issue was the act of a security guard, who, engaging in horseplay, accidentally shot a construction worker in the foot. The shooting occurred when the guard, standing outside the construction employees' recreation room, tried to remove a gun from his holster to scare and have "fun" with a different construction worker. The guard's employer had given him specific instructions not to "bother" the construction workers. The court found that neither the horseplay nor the resulting shooting was done in furtherance of the employer's interests. Rather, they occurred when the guard "embarked upon an independent venture to satisfy his own personal desire to have 'fun' and 'play' around." *Id.* at 903; *see also Abernathy v. Romaczyk*, 202 Va. 328, 117 S.E.2d 88, 92 (1960) (holding that employee's argument and scuffle with plaintiff were "an independent venture of his own, and the relation of master and servant was for the time suspended"). These cases hardly support the creation of a "dual purpose doctrine."

I would not, therefore, disturb the district court's finding that Admiral Carter acted outside the scope of his employment. The alleged incident occurred in Carter's garden where, dressed in casual civilian clothing, he was engaged in a quintessential civilian activity. The court correctly determined that the single traffic incident, even against a backdrop of general complaints, did not pose a grave and immediate problem. Resolution of the issue could easily have been postponed until the next day—a normal working day, during which the Admiral could have determined the facts in his office under normal military procedure and perhaps could have done so dispassionately. It is significant to me, and apparently was also to the district court, that Carter had received previous complaints about the discourtesy of the base's security officers but waited until the Sunday incident involving his wife and daughter to take action. These circumstances suggest personal and familial concerns, not a concern for furthering the military's interests.

### III

In sum, I believe the district court acted according to statutory jurisdiction when it reviewed the Attorney General's certification for purposes of substitution, and it correctly determined that Admiral Carter acted outside the scope of his authority.

It is important to remember that we are not faced with the question whether the commission of a tort can be within the scope of employment. *Wallen v. Domm*, 700 F.2d 124, 126 (4th Cir.1983) (per curiam), answered that question in the affirmative. We are faced, rather, with the question whether the commission of a tort

---

**9.** Uniform Code of Military Justice art. 133(a) (codified at 10 U.S.C. § 933); *id.* art. 133(c)(3).

**10.** 32 C.F.R. § 700.702(b) provides:

A commanding officer who departs from his orders or instructions, or takes official action which is not in accordance with such orders or instructions, does so upon his own responsibility....

by a government employee is always within the scope of employment when the Attorney General certifies that it is. I believe it is not, and therefore dissent.

I am authorized to state that Chief Judge ERVIN, and Judges PHILLIPS and MURNAGHAN join in this dissent.